# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v DUFF

Docket No. 163961. Argued on application for leave to appeal on October 4, 2023. Decided July 26, 2024.

Matthew S. Duff was charged in the Oakland Circuit Court with operating a motor vehicle while intoxicated, third offense, MCL257.625(1) and (9)(c). Police officers saw a parked car with its engine running in an elementary school's parking lot at 10:00 p.m.; the car was parked at the edge of the parking lot, facing the grass. The parking lot had two travel lanes between rows of parking spaces, which allowed for two cars to travel in either direction between rows of parked cars. The officers pulled into the lot and parked 10 feet behind the parked car at a 45-degree angle. According to one officer, he parked the patrol car in such a way that there would have been a collision had the parked car backed straight out. The patrol car's headlights and spotlight were directed at the parked car. The officers left their car and approached the parked car, with one officer on either side of the car. Defendant was in the driver's seat of the parked car with the windows rolled down. The officers questioned defendant, noticed signs that he was intoxicated, asked defendant to exit the car and perform field sobriety tests, and arrested defendant when he failed those tests. Defendant later consented to a blood draw and admitted that he had been drinking alcohol that night. Defendant moved to suppress the evidence of his intoxication, arguing that it was fruit of an unlawful seizure. The court, Denise Langford Morris, J., denied the motion. Defendant sought interlocutory leave to appeal, which the Court of Appeals denied. *People v Duff*, unpublished order of the Court of Appeals, entered March 27, 2019 (Docket No. 347603). Defendant then sought leave to appeal in the Supreme Court, and in lieu of granting defendant's application, the Supreme Court remanded the case to the trial court for reconsideration of defendant's suppression motion, directing that court to determine when defendant was first seized for purposes of the Fourth Amendment of the United States Constitution. 504 Mich 995 (2019). On remand, the trial court granted defendant's motion to dismiss, reasoning that defendant was seized at the time the patrol vehicle was parked behind him because, at that point, a reasonable person would not have believed that they were free to leave. The prosecution appealed, and in an unpublished per curiam opinion issued on November 23, 2021 (Docket No. 354406), the Court of Appeals, BORRELLO and O'BRIEN, JJ. (SHAPIRO, P.J., dissenting), reversed, holding that the trial court erred when it concluded that the police officer seized defendant when he parked his patrol car 10 feet away from defendant's vehicle at a 45-degree angle. In reaching that conclusion, the Court reasoned that defendant was not limited to driving onto the grass to exit the parking lot because the police vehicle only partially obstructed defendant's ability to move the vehicle—in

fact, defendant could have instead turned his vehicle as he was backing out—and no other coercive police behavior transformed the encounter into a seizure. Defendant sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 510 Mich 952 (2022).

In an opinion by Justice BERNSTEIN, joined by Justices CAVANAGH, WELCH, and BOLDEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

A seizure may occur when a police vehicle partially blocks a defendant's egress if the totality of the circumstances indicate that a reasonable person would not have felt free to leave; while the position of the police vehicle is an important consideration to how a reasonable person would evaluate the encounter, courts must also consider the remainder of the police conduct during the encounter to evaluate whether a seizure has occurred. Additional considerations in evaluating the totality of the circumstances include whether the police clearly meant to initiate contact with the defendant and any relevant social expectations, both of which may make a reasonable person feel they were not free to leave. The judgment of the Court of Appeals was reversed because the totality of the circumstances established that defendant was seized before the officers observed signs of intoxication. The case was remanded to the Court of Appeals to determine whether Deputy Jason Pence had reasonable suspicion of criminal conduct when defendant was initially seized. To the extent the Court of Appeals decision in *People v Anthony*, 327 Mich App 24 (2019), established a bright-line test that a person's car is seized only if their car is *completely* blocked in by law enforcement, that decision was overruled as inconsistent with consideration of the totality of the circumstances.

1. Both the United States and Michigan Constitutions protect people from unreasonable searches and seizures. A warrantless search or seizure is presumed unconstitutional unless shown to be within one of several established exceptions. An investigatory stop is one such exception, and it allows police to briefly seize an individual if the officer has a reasonably articulable suspicion that criminal activity is afoot. Not all police encounters trigger Fourth Amendment scrutiny, however. Indeed, a seizure does not occur simply because a police officer approaches an individual and asks a few questions. Instead, an encounter is consensual, and no reasonable suspicion is required, so long as a reasonable person would feel free to disregard the police and go about their business. In determining whether a person has been seized for purposes of the Fourth Amendment, courts apply a totality-of-the-circumstances test: i.e., whether, viewing all the circumstances surrounding the incident, a reasonable person would have believed they were not free to leave. The focus of this objective test is on a reasonable person's interpretation of police conduct. Thus, what constitutes a restraint on liberty prompting a person to conclude that they are not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs. However, in situations where a person might not wish to leave because of reasons independent of police actions, a more precise statement of the test asks whether a reasonable person would have felt free to *decline* an officer's requests or to otherwise terminate the police encounter. While a police officer's complete blocking of a person's means of egress in a vehicle could be a sufficient condition to find that a seizure has occurred, it is not a necessary condition because the seizure test requires consideration of all the facts and circumstances. Thus, a seizure may occur when a police vehicle partially blocks a defendant's egress if the totality of the circumstances indicate that a reasonable person would not have felt free

to leave. Accordingly, while the position of the police vehicle is an important consideration to how a reasonable person would evaluate the encounter, courts must also consider the remainder of the police conduct during the encounter to evaluate whether a seizure occurred. An additional consideration under the totality-of-the-circumstances test is whether it is clear that a police officer meant to initiate contact with the defendant and that the defendant was not free to leave. While there are valid safety reasons for police officers to approach a vehicle that they are investigating from multiple sides and to use flashlights in dim light, such actions also limit the available paths of egress for a reasonable driver. Actions taken with officer safety in mind can simultaneously constitute a show of authority—for example, consider the act of drawing a flashlight or a firearm. Whether a police officer's prudential procedures are justified has little bearing on whether a reasonable person might feel free to leave or otherwise terminate an encounter. To the extent that the *Anthony* Court established a bright-line test that a seizure occurs only if the person's car was *completely* blocked in, that decision was overruled because it was inconsistent with general Fourth Amendment jurisprudence in that it failed to consider whether a reasonable person would have felt free to leave the scene under the totality of the circumstances; such bright-line rules are necessarily at odds with Fourth Amendment analysis given that the reasonable-person standard is an imprecise test.

2. The trial court clearly erred when it found that defendant's only means of egress was to drive over the grass in front of him. Defendant could have turned his steering wheel while backing up and driven over empty parking spaces to move his vehicle away from the police encounter. Accordingly, the police here did not completely block defendant in. However, although that would not constitute a misdemeanor or traffic infraction, a reasonable person would likely assume that driving over the painted spaces is either explicitly prohibited or at least frowned upon while driving under direct police surveillance; this social expectation is relevant in considering the totality of the circumstances. While defendant's car was only partially blocked in, the remaining police conduct combined with that fact made the police conduct coercive for purposes of Fourth Amendment analysis: (1) the headlights and spotlight of the patrol car were activated and shining into defendant's parked car, (2) the encounter took place at 10:00 p.m. on a Sunday in an empty parking lot, so it would have been clear that the police were there solely to make contact with defendant, (3) the police exited their patrol vehicle and approached defendant's car on either side, with at least one officer shining his flashlight into the vehicle, and (4) had defendant attempted to back out of the parking space, he would have had to turn the wheel to reverse at an angle and would have risked striking at least one of the officers. Although law enforcement approaching a parked vehicle is not, on its own, a coercive act giving rise to a seizure, under the circumstances of this case, a reasonable person would likely not believe they had license to move their vehicle in ways that could endanger a police officer. Under these facts, because a reasonable person would not have felt free to leave the scene, even though officers did not activate their emergency lights or siren, defendant was seized for purposes of the Fourth Amendment before the officers observed signs of intoxication. The judgment of the Court of Appeals was therefore reversed, and the case was remanded to the Court of Appeals for consideration of whether, in light of the Court's conclusion that defendant was seized under the circumstances of the police encounter in this case, Deputy Pence had reasonable suspicion of criminal conduct when defendant was initially seized.

Court of Appeals judgment reversed; case remanded to the Court of Appeals for further proceedings.

Justice WELCH, concurring, joined the majority opinion in full and agreed with the disposition of the case but wrote separately to voice her concerns about whether the federal standard for determining whether a person has been seized for purposes of the Fourth Amendment of the United States Constitution is consistent with Article 1, § 11 of Michigan's 1963 Constitution. A seizure occurs under the Fourth Amendment when governmental agents use either physical force or a show of authority to restrain a person's liberties. The current federal test is purportedly an objective standard; that is, it asks whether under the totality of the circumstances, a reasonable person would have believed they were free to leave, free to decline a request from law enforcement, or free to terminate the interaction with law enforcement. As reflected by prior decisions of the Michigan Supreme Court, there has been continuous debate regarding what a reasonable person would think during interactions with law enforcement, including debate regarding what actions are sufficient to establish an adequate showing of physical force or government authority to give rise to a seizure. These debates reflect disagreement about whether a reasonable person is more analogous to the average law-abiding civilian or some judicially crafted ideal of such a person. While academics have opined that most people do not feel free to leave or terminate encounters with law enforcement, federal courts have concluded otherwise, ignoring the realities on the street that civilians feel a large amount of compulsion to comply. Indeed, it has been questioned whether a literal application of the test set forth in *United States v Mendenhall*, 446 US 544 (1980) (opinion by Stewart, J.), and *Florida v Royer*, 460 US 491(1983) (the *Mendenhall-Royer* reasonable-person test) would result in virtually all police-citizen encounters being characterized as seizures. The standard has been criticized as unworkable (1) because the outcome of a case can turn on subtle factual distinctions that are unrelated to an individual's actual right to end an encounter with law enforcement, which makes it difficult for law enforcement to apply the standard in the field and (2) because the test does not consider the purpose of the encounter, it does not sufficiently protect an individual's rights. Empirical studies support some of these concerns, finding that most reasonable persons would not feel free to leave or disengage from an interaction with law enforcement, regardless of United States Supreme Court findings that they would. That the federal *Mendenhall-Royer* test has not been applied by courts in a literal sense begs the question whether the established reasonable-person test, as it has been applied over time, provides a workable objective standard for determining whether a seizure has occurred under the Fourth Amendment. For those reasons, and because the *Mendenhall-Royer* test was adopted years after Michigan's current Constitution, Justice WELCH questioned whether compelling reasons might exist to interpret the protections afforded under Const 1963, art 1, § 11 differently than those provided by its federal counterpart. In sum, Justice WELCH questioned whether a different test for determining whether a person has been seized would be more consistent with Michigan's Constitution than the current understanding set forth by the *Mendenhall-Royer* test.

Chief Justice CLEMENT, dissenting, disagreed with the majority's conclusion that the officers seized defendant before Deputy Pence saw signs that defendant was intoxicated. Although the *Mendenhall-Royer* free-to-leave test emphasizes how a reasonable person would *feel*, Chief Justice CLEMENT would not read the test too literally. Rather, as the United States Supreme Court has clarified, the question is what the officer's words and conduct would have *communicated* to a reasonable person, not how the officer's presence would have made a reasonable person feel. The focus is thus on whether an officer objectively communicates by means of physical force or a show

of authority that he or she is restraining the person's liberty. This harmonizes the free-to-leave test with the United States Suprem Court's and the Michigan Supreme Court's reminder that not all encounters between the police and citizens are seizures. Because people rarely feel free to walk away when the police initiate an encounter with them, arguably every encounter between the police and an individual would be a seizure; but precedent makes clear that the Fourth Amendment does not stretch that far. Thus, the issue in this case was whether the officers' conduct would have communicated to a reasonable person in defendant's position that he was not free to ignore the officers, not whether the officers' presence would have made a reasonable person feel as if they must cooperate. The fact that the officers only partially blocked in defendant's car did not automatically mean that the encounter was consensual. Instead, even though a partial restriction alone typically will not amount to a seizure, courts must still consider the remaining circumstances of the encounter and weigh whether these circumstances, plus the partial restriction, would have collectively conveyed a coercive message to a reasonable person. Although it was close case, the facts here would not have communicated to a reasonable person in defendant's position that he was not free to leave or to ignore the officers. The officers' vehicle only minimally restricted defendant's ability to drive his car out of the parking lot, and the remaining conduct would not have communicated a coercive message to a reasonable person. Accordingly, the officers did not seize defendant after they parked their vehicle and began approaching defendant's car. Chief Justice CLEMENT agreed with the majority that *Anthony* had to be overruled to the extent the decision suggested that a partial blockage of a parked car is irrelevant in determining whether a seizure by show of authority occurred, but she would have affirmed the judgment of the Court of Appeals in this case.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, disagreed with the majority's conclusion that defendant was seized when the police officers positioned their patrol vehicle behind defendant's vehicle, partially obstructing his egress, activated the patrol vehicle's spotlight, and approached defendant's vehicle. By reaching that conclusion, the Court continues its recent trend of mischaracterizing routine interactions between law enforcement and citizens. The majority misapplied the *Mendenhall-Royer* free-to-leave test to characterize a routine street encounter as a seizure. But a seizure only occurs when a police officer restrains the liberty of a citizen by means of physical force or a coercive show of authority. The majority conceded that driving over the painted spaces of a parking lot would not be a misdemeanor or traffic infraction, but then—without citing any authority—stated that a reasonable driver would likely assume that driving over them is either explicitly prohibited or at least frowned upon. The majority summarily concluded that this purported social expectation is relevant and relied on it to create a new, vague, "frowned upon" factor that tends to show a seizure. Justice VIVIANO questioned how the majority's new-found social expectation not to drive over a parking space could be relevant when courts across the country have repeatedly emphasized that a police-citizen encounter does not become a seizure simply because citizens may feel an inherent social pressure to cooperate with the police. While the majority correctly concluded that the trial court clearly erred by finding on remand that defendant's vehicle was completely blocked in, the majority's finding that defendant could only have left by driving over the painted lines of an empty parking space was also clearly erroneous because the trial court did not make that finding, and there was no record evidence to support it. Instead, defendant could have left by simply backing up and turning his wheel. In sum, while a partial blockage of a defendant's egress is a factor to consider in the *Mendenhall-Royer* test, the majority failed to support its new "frowned upon" test and its decision to apply it in this

case. Importantly, there was no other coercive conduct that transformed this routine police encounter into a seizure. That is, the conduct did not include a coercive show of authority that went beyond the inherent pressure of speaking with the officer. Deputy Pence did not activate his siren or overhead lights; he did not drive his vehicle or approach defendant in an aggressive manner; there were only two police officers present; they did not draw their weapons or point them at defendant; the officers did not give any commands or speak in a loud voice; and they did not completely block defendant's egress or otherwise prevent him from leaving. It was reasonable for the officers to use their headlights, spotlight, and flashlights for their safety and the safety of others given that it was dark outside. And there was no evidence that they were unusually bright or flashing, or that defendant was blinded or overwhelmed by the light. Under those circumstances, a reasonable person would understand that these common police practices were used for safety purposes, not as a show of authority. Thus, the majority erred by relying on those practices to support its conclusion that a seizure occurred. Further, the fact that the majority counted as coercive that the police were in the parking lot solely to make contact with defendant makes little sense because the majority's position would credit law enforcement's efforts only if the officer's contact with a suspicious vehicle is accidental. The majority's opinion will cause confusion because it fails to provide clarity to lower courts and law enforcements officers, and it imposes wholly unrealistic restrictions on a wide variety of legitimate law enforcement practices. Justice VIVIANO opined that, as a result, the work of policing will be more difficult and more dangerous, resulting in Michigan communities being less safe. Justice VIVIANO would not have overruled *Anthony* because it did not include the holding that the majority purports to overrule, and he would have affirmed the Court of Appeals in this case.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 26, 2024

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 163961

MATTHEW SCOTT DUFF,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

In this case, we consider whether a police encounter constituted a seizure under the Fourth Amendment when the police partially blocked in defendant's vehicle in an empty parking lot at night, pointed their spotlight and headlights at his car, and then approached defendant's vehicle with at least one officer shining his flashlight into the vehicle. We hold that because a reasonable person would not have felt free to leave or discontinue the encounter, defendant was seized at that point, which triggers Fourth Amendment scrutiny.

Because the applicable standard is an objective one that measures what a reasonable person would do under the totality of the circumstances, the extent to which a defendant is physically blocked in by the police is but one factor to consider. Accordingly, we also reverse *People v Anthony*, 327 Mich App 24; 932 NW2d 202 (2019), to the extent that the opinion held that a defendant is only seized when the police have completely blocked in a parked vehicle.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The underlying facts are largely undisputed. On March 4, 2018, Deputy Jason Pence and his training officer were driving on routine patrol at night in Pontiac, Michigan. Around 10:00 p.m., Pence drove by Walt Whitman Elementary School, where he saw a lawfully parked car with an engine running in the otherwise empty school parking lot.

The parking lot contained two travel lanes between rows of parking spaces, such that two cars could be traveling in either direction between rows of parked cars. The car in question was parked at the edge of the parking lot, facing the grass. Pence pulled into the lot and parked 10 feet behind the parked car at a 45-degree angle. Pence would later testify that he was positioned in a manner such that if the parked car backed straight out, there would have been a collision. Although Pence did not activate either his emergency lights or siren, he did activate his headlights and spotlight, with the spotlight pointed at the driver of the parked car. At this point, both officers left their vehicle and approached the parked car on either side, in full uniform and visibly armed. They approached defendant, Matthew Duff, who was in the driver's seat of the parked car with the windows rolled down. The officers initiated questioning and immediately asked defendant for his driver's

license, registration, and proof of insurance. Pence noticed signs of intoxication during this interaction, asked defendant to exit his car and perform field sobriety tests, and placed defendant under arrest when he failed those tests. Defendant also gave his consent for a blood draw and admitted to drinking alcohol that night.

Defendant was subsequently charged with operating a motor vehicle while intoxicated, third offense, MCL 257.625(1) and MCL 257.625(9)(c). Defendant moved to suppress the evidence of his intoxication, arguing that it was fruit of an unlawful seizure. On November 9, 2018, the trial court denied defendant's motion in an opinion and order. On March 27, 2019, the Court of Appeals denied defendant's interlocutory application for leave to appeal. *People v Duff*, unpublished order of the Court of Appeals, entered March 27, 2019 (Docket No. 347603). On October 29, 2019, in lieu of granting defendant's application for leave to appeal that order, this Court remanded the case to the trial court for reconsideration of defendant's suppression motion, stating in relevant part:

> On remand, the circuit court shall determine when the defendant was first seized for Fourth Amendment purposes. See *People v Jenkins*, 472 Mich 26, 32[; 691 NW2d 759] (2005) ("A 'seizure' within the meaning of the Fourth Amendment occurs only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave."). This is the relevant point in time for assessing whether the deputies had probable cause to justify an arrest or a reasonable suspicion of criminal activity to justify a stop under *Terry v Ohio*, 392 US 1[; 88 S Ct 1868; 20 L Ed 2d 889] (1968). [*People v Duff*, 504 Mich 995, 995 (2019).]

On March 4, 2020, the trial court held a hearing on remand and took the matter under advisement. On July 14, 2020, the trial court issued an opinion and order granting defendant's motion to suppress, finding in relevant part that "[t]he defendant's only means to exit is driving over the grass in front of him (status conference 3/4/2020). Under those

3

circumstances, a reasonable person would have believed that he or she was not free to leave; thus constituting a seizure."[1]  The trial court further concluded that, prior to the seizure, the deputy was "unable to articulate an 'unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.' " Quoting *Terry*, 392 US at 30.  On July 23, 2020, the trial court granted defendant's motion to dismiss.

The prosecution appealed.  On November 23, 2021, the Court of Appeals reversed in a split unpublished per curiam decision.  *People v Duff*, unpublished per curiam opinion of the Court of Appeals, issued November 23, 2021 (Docket No. 354406).  Defendant then

---

[1] Any dispute over the relevant facts appears to center on this point: whether defendant's only means of egress was to drive out of the parking lot onto the grass in front of him. Deputy Pence had testified that, given the angle at which he parked behind defendant's car, two cars would not have been able to pass in the travel lanes between the parking spaces. However, in response to a later question on cross-examination, Deputy Pence confirmed that defendant could have exited the parking lot while staying on the paved blacktop.  Given that defendant was parked at the edge of the parking lot, facing grass, and given Deputy Pence's explanation of how each car was situated in relation to the other, the implication appears to be that defendant could have backed out of his parking space while turning to avoid the police car and then driven across the empty parking spaces in order to avoid striking the police car.  This appears to be how the prosecutor also understood and explained the situation on remand:

> [Defendant] would have hit the officer's vehicle had he continued to pull back, but if he had just turned his wheel, he would have avoided . . . the officer's vehicle and could have pulled out without an issue over the parking spots, not necessarily the grass.

It is confusing why Justice VIVIANO faults this opinion for relying on "an incorrect description of a witness's testimony by an attorney," given that the prosecutor's statement is reflective of Deputy Pence's own testimony that he was parked in such a way to block the travel lanes of the parking lot.

4

sought leave to appeal in this Court. On October 5, 2022, we ordered oral argument on the application, directing the parties to address:

> (1) whether the totality of the circumstances surrounding the officers' conduct of partially obstructing the defendant's ability to move his vehicle would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter, see *People v Lucynski*, 509 Mich 618[; 983 NW2d 827] (2022); and (2) whether *People v Anthony*, 327 Mich App 24, 40[; 932 NW2d 202] (2019), correctly held that "only if officers completely block a person's parked vehicle with a police vehicle is the person seized." [*People v Duff*, 510 Mich 952, 952 (2022).]

## II. STANDARD OF REVIEW

Questions of constitutional law are reviewed de novo. *Johnson v VanderKooi*, 509 Mich 524, 534; 983 NW2d 779 (2022), quoting *Associated Builder & Contractors v Lansing*, 499 Mich 177, 183; 880 NW2d 765 (2016). When reviewing a motion to suppress, this Court reviews for clear error a trial court's factual findings. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014). " 'To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo.' " *Id.*, quoting *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001).

## III. FOURTH AMENDMENT

The Fourth Amendment of the United States Constitution protects the people from unreasonable searches and seizures. US Const, Am IV. The Michigan Constitution

5

contains a similar provision. Const 1963, art 1, § 11.[2] "A warrantless search or seizure is presumed unconstitutional unless shown to be within one of several established exceptions." *Lucynski*, 509 Mich at 637. One such established exception is the investigatory stop, which permits police to briefly seize an individual "if the officer has a reasonably articulable suspicion that criminal activity is afoot." *Id.* See also *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005) ("A brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot.").

However, not all police encounters trigger Fourth Amendment scrutiny, because "mere police questioning does not constitute a seizure." *Florida v Bostick*, 501 US 429, 434; 111 S Ct 2382; 115 L Ed 2d 389 (1991). See also *Lucynski*, 509 Mich at 636 ("Some interactions with the police do not rise to the level of a 'seizure' under the Fourth Amendment."). The United States Supreme Court has explained that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Bostick*, 501 US at 434 (quotation marks and citation omitted).

A person has been "seized" within the meaning of the Fourth Amendment "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Immigration & Naturalization Serv v Delgado*, 466

---

[2] The Michigan provision has generally been construed to provide the same protection as that secured by the Fourth Amendment, absent a compelling reason otherwise. See *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991).

6

US 210, 215; 104 S Ct 1758; 80 L Ed 2d 247 (1984) (quotation marks and citation omitted); see also *Jenkins*, 472 Mich at 32. The Supreme Court has therefore declined to adopt a bright-line rule in this area and has, instead, relied on the application of a totality-of-the-circumstances test. *Michigan v Chesternut*, 486 US 567, 572-573; 108 S Ct 1975; 100 L Ed 2d 565 (1988). This is an objective standard that is focused on a reasonable person's interpretation of police conduct. *Id*. at 573-574. "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Id*. at 573. Accordingly, "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id*. In situations where a person might not wish to leave because of reasons independent of police actions, a more precise statement of the test asks whether a reasonable person would have felt free to decline an officer's requests or to otherwise terminate the police encounter. *Bostick*, 501 US at 439.

With these standards in mind, we consider whether the police encounter in this case constitutes a seizure within the meaning of the Fourth Amendment. We begin by noting that the Court of Appeals panel here looked to *Anthony* for guidance. In *Anthony*, 327 Mich App at 29, the police came across a truck that was parked at a street curb, and the police pulled up alongside the truck.[3] The Court of Appeals majority held that "[t]he standard for determining whether an individual would have felt free to leave under such

---

[3] There appear to have been significant discrepancies in the *Anthony* record about the exact placement of the vehicles and other physical obstacles that may have impeded egress. For our analysis here, we assume the facts are correct as described by the Court of Appeals majority in *Anthony*.

circumstances . . . is whether the person's parked car was 'blocked' in[.]" *Id*. at 39. The Court of Appeals majority had, in turn, relied on a United States Court of Appeals for the Sixth Circuit opinion, which had held that "only if officers *completely block* a person's parked vehicle with a police vehicle is the person seized." *Id*. at 40 (emphasis added), citing *United States v Carr*, 674 F3d 570, 573 (CA 6, 2012). Because the Court of Appeals majority concluded that the defendant would have been able to drive away with a "little maneuvering," it held that there was no seizure. *Anthony*, 327 Mich App at 40.

In this case, the Court of Appeals majority relied on both *Carr* and *Anthony* for the proposition that, because defendant could have exited his parking space with some maneuvering, he was not seized. *Duff*, unpub op at 3-4. In so holding, the Court of Appeals majority noted that the record establishes that defendant was not limited to driving onto the grass as the trial court had believed and that defendant could have instead turned as he was backing out. *Id*. Because the Court of Appeals majority noted that the position of the police vehicle alone did not turn the encounter into a seizure, they examined whether there was other coercive behavior that transformed the encounter into a seizure. Finding none, the Court of Appeals majority concluded that defendant was not seized and that his Fourth Amendment rights were thus not implicated. *Id*. at 4-5.

Although the trial court concluded that defendant's only means of egress was to drive over the grass in front of him, we agree with the Court of Appeals majority that Deputy Pence's conduct only "partially obstruct[ed] defendant's ability to move his vehicle . . . ." *Id*. at 3. The record evidence indicates that the patrol car was parked approximately 10 feet behind defendant's vehicle at approximately a 45-degree angle. Defendant could not back straight out of his parking spot without striking the patrol vehicle,

8

but he could have turned his steering wheel while backing up and driven over empty parking spaces to move his vehicle away from the police encounter. Accordingly, we are left with a definite and firm conviction that the trial court's factual findings were made in error.

The Court of Appeals majority was right in noting that defendant was not *completely* blocked in because there was a means of egress available to him. However, as stated by the Court of Appeals dissent:

> This reasoning . . . misconstrues the test for whether a seizure occurs within the meaning of the Fourth Amendment. The Fourth Amendment does not turn on a measuring tape or the existence of some demanding but conceivable means of departure; the question is not whether leaving was physically possible but whether a reasonable person would believe he was free to leave. [*Id.* (SHAPIRO, P.J., dissenting) at 2.]

That is, while completely blocking a person's means of egress in a vehicle could be a sufficient condition to find that a seizure occurred, it is not a necessary condition because the seizure test requires consideration of all the facts and circumstances. To the extent that *Anthony* reached the opposite conclusion, we overrule it as being inconsistent with general Fourth Amendment jurisprudence, which focuses not only on the technical ability of a driver to maneuver out of a certain position, but on whether a reasonable person would have felt free to leave the scene under the totality of the circumstances. In other words, insofar as portions of *Anthony* purport to establish a bright-line rule about when a police car's positioning can result in a seizure, we clarify that bright-line rules are necessarily at

9

odds with Fourth Amendment analysis given that the reasonable-person standard is an imprecise test.[4] See *Chesternut*, 486 US at 573-574.

A comparison to our recent decision in *Lucynski* is helpful at this juncture. In *Lucynski*, an officer parked behind the defendant, who was in his vehicle in a one-car private driveway. The defendant exited his vehicle before the police officer exited his patrol car and began questioning the defendant. This Court recognized, "If a reasonable person in [the] defendant's place did not have an independent desire to leave, but nevertheless did not want to interact with [the police officer]," the only other options available to the defendant would have been to attempt to enter a home that the defendant did not own and without the consent of the homeowner or to walk "into a frozen field some distance from town in a rural area." *Lucynski*, 509 Mich at 645-646. "Neither would be a viable option from the perspective of a reasonable person after having been followed and then blocked in by a police officer." *Id*. at 646. We held that, under the totality of the circumstances, it was clear that the officer meant to initiate contact with the defendant and that the defendant was not free to leave. *Id*. at 643-646. This Court concluded that the defendant had been "seized at the moment the officer blocked defendant's car in the driveway with a marked police vehicle." *Id*.

---

[4] Regardless of how Justice VIVIANO reads *Anthony*, the opinion incorrectly stated that "only if officers completely block a person's parked vehicle with a police vehicle is the person seized." *Anthony*, 327 Mich App at 40. While Justice VIVIANO claims that "overruling *Anthony* is entirely unnecessary," see note 3 of Justice VIVIANO's dissenting opinion, we believe it more prudent to eliminate overbroad or legally incorrect statements in a published Court of Appeals opinion in order to prevent potential misapplication of that holding in the future.

10

The case before us may be distinguished factually from *Lucynski* because here the police vehicle did not completely block defendant's vehicle's sole means of egress in a driveway. But the record, including Deputy Pence's own testimony and the dashcam video, is clear that defendant would have had to either drive onto the grass to avoid police contact or carefully maneuver around the police car and drive over the painted spaces of the parking lot to leave.[5] Although defendant's vehicle here may not have been completely physically blocked in, this is not in itself dispositive of whether a seizure occurred. When the police have impeded a vehicle's path of egress by placing obstacles in it, even if egress is not entirely blocked, this remains a factor that a reasonable person would take into consideration when deciding whether they were free to leave the scene or otherwise decline to interact with the police.

While the position of the patrol car is important to how a reasonable person would evaluate the encounter, the remainder of the police conduct during the encounter must also be considered. To the extent that the prosecution argues there were no other signs of coercive action here, we disagree. Deputy Pence had activated the headlights and spotlight of the patrol car, which were shining onto defendant's parked car upon approach, and he parked in a manner to block the travel lanes in the parking lot with the knowledge that defendant's car was positioned up against the edge of the parking lot. It is also meaningful to note that this encounter took place at 10:00 p.m. on a Sunday in an empty parking lot

---

[5] While driving over the painted spaces of a parking lot might not have resulted in a misdemeanor or a traffic infraction, a reasonable driver would likely assume that driving over them is either explicitly prohibited or at least frowned upon, especially while driving under direct police surveillance. This social expectation is relevant because the touchstone of Fourth Amendment analysis is always reasonableness.

where, as in *Lucynski*, it would have been clear that the police were there solely to make contact with defendant. See *Chesternut*, 486 US at 573 (noting that whether a seizure occurred may depend on the setting of the police encounter). A reasonable person is less likely to feel free to leave when they are the sole focus of law enforcement attention in an isolated area after dark.

Another relevant consideration is that the police officers here exited their patrol vehicle and approached defendant's car on either side, with at least one officer shining his flashlight into the vehicle. While there are valid safety reasons for police officers to approach a vehicle that they are investigating from multiple sides and to use flashlights in dim light, such actions also limit the available paths of egress for a reasonable driver. Actions taken with officer safety in mind can simultaneously constitute a show of authority—for example, consider the act of drawing a flashlight or a firearm. Whether a police officer's prudential procedures are justified has little bearing on whether a reasonable person might feel free to leave or otherwise terminate an encounter. Importantly, when police officers are in close proximity to a vehicle they are investigating, any attempt at maneuvering the vehicle to leave the scene could put the officers' safety at risk. Here, the police vehicle was parked in a manner that would have required defendant to make a sharp backward turn to leave the area at a time when his vision was impaired by lights shining into his vehicle and a police officer was standing very close to his vehicle on either side. The record in this case, including the dashcam video, demonstrates that had defendant attempted to turn his wheel to reverse at an angle, he would have risked striking at least one of the police officers, who had exited their vehicle and were in close proximity to the sides of defendant's car. Although law enforcement approaching a parked vehicle

12

is not, on its own, a coercive act giving rise to a seizure, under the circumstances of this case, a reasonable person would likely not believe they had license to move their vehicle in ways that could endanger a police officer.

While the facts are not the same as in *Lucynski*, "[u]nder the circumstances of this case, . . . a reasonable person would not have felt free to leave the scene, even though the police officer did not activate emergency lights or a siren." *Lucynski*, 509 Mich at 643.[6]

_____

[6] The Court's conclusion is based on the unique circumstances of this case and a thorough consideration of all relevant circumstances. We disagree with Justice VIVIANO's suggestion that our holding is an outlier when compared to decisions from other jurisdictions. While there are certainly courts that have concluded that no seizure occurred under relatively similar circumstances, as Justice VIVIANO acknowledges, there are also decisions reaching the opposite conclusion under facts that are similar to this case. See, e.g., *United States v Delaney*, 446 US App DC 272, 274-275, 277-279; 955 F3d 1077 (2020) (holding that a seizure occurred when officers parked within three to four feet of the nose of the defendant's car in a narrow parking lot, significantly restricting the defendant's movement such that multiple turns would have been needed to leave, and the police activated their "take-down light" spotlights); *United States v Smith*, 794 F3d 681, 684-685 (CA 7, 2015) (holding that when a police encounter occurs "at night" and "in a dark alley," a reasonable person would not feel free to "ignore the police presence"); *State v Garcia-Cantu*, 253 SW3d 236, 244-249 (Tex Crim App, 2008) (holding that a seizure occurred when a police vehicle parked 10 feet behind a truck on a dead-end road at night, blocking the truck; activated a spotlight; used a commanding voice; and shone a flashlight on the occupant as he exited the vehicle); *Commonwealth v Mulholland*, 794 A2d 398, 399; 2002 PA Super 59 (2002) (holding that a seizure occurred when, in a low-crime rural area, an officer pulled a marked police vehicle "into the lot and parked in front of the van, with the purpose of blocking its means of egress," and the officer activated the patrol vehicle's alley lights); *Mosby v State*, 575 So 2d 304, 305-306 (Fla App, 1991) (holding that a reasonable person would not feel free to leave when "the police cruiser was positioned[] behind the appellant's vehicle with its high beams and spotlight on"; the officers approached the vehicle, "each walking up either side of the appellant's vehicle"; and the officer testified that he would not have let the appellant leave); *People v Trujillo*, 773 P2d 1086, 1090 (Colo, 1989) (holding that, by shining their patrol car's headlights into the eyes of the defendants and blocking the path of the on-foot defendants, the police had approached the defendants with implied force such that any reasonable person would not have felt free to leave or disregard the police presence). Like the Court's analysis in this

We hold that defendant was seized, triggering Fourth Amendment scrutiny, because he would not have felt free to leave or otherwise terminate the police encounter under the totality of the circumstances when Deputy Pence pulled behind defendant's vehicle at a 45-degree angle, obstructing defendant's egress, while also shining a spotlight and headlight at defendant's vehicle, and when he and another police officer immediately approached defendant's car from both sides while at least one of the officers was shining his flashlight into the vehicle.[7]

---

case, each of these decisions was based on a fact-intensive analysis of the circumstances of the individual case.

[7] Justice VIVIANO argues, without explanation, that our holding will endanger both individual police officers as well as the community at large. Confusingly, this appears to be somewhat grounded in a critique of *Terry* itself, see note 12 of Justice VIVIANO's dissenting opinion, although this opinion does not opine on *Terry* and it is of course understood that *Terry* is binding precedent that this Court has no power to overrule.

To be clear, we merely conclude that defendant was seized, such that the Fourth Amendment applies to the police encounter. We do not find that the police here violated defendant's constitutional rights, as we merely decide a threshold issue. It goes too far to say that this opinion stands for the proposition that defendant was "illegally seized in violation of the Fourth Amendment" because not all seizures render constitutional violations, see, e.g., investigative stops conducted under *Terry*. In other words, it does not necessarily follow that a defendant's constitutional rights have been violated even if a defendant has been seized, and our opinion does not change that unremarkable proposition. To the extent that Justice VIVIANO argues that this opinion serves to denigrate excellent police work by finding that Deputy Pence engaged in illegal activity, we have not and do not make any holdings in this opinion about whether defendant's Fourth Amendment rights were violated. Instead, that question will be determined on remand by the Court of Appeals when it considers whether the seizure was accompanied by a reasonable suspicion of criminal conduct.

IV. CONCLUSION

Because we hold that defendant was seized before the officers observed signs of intoxication, we reverse the judgment of the Court of Appeals. We remand to the Court of Appeals for consideration of whether, in light of our conclusion that defendant was seized under the circumstances of the police encounter in this case, Deputy Pence had reasonable suspicion of criminal conduct when defendant was initially seized. See *id*. at 626. If the Court of Appeals affirms the trial court's holding that there was no reasonable suspicion of criminal conduct, the Court of Appeals should then consider in the first instance whether the exclusionary rule applies.[8] We do not retain jurisdiction.

Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

---

[8] The prosecution has argued that, even if the police lacked reasonable suspicion here, the exclusionary rule should apply. Although it is premature to opine on this issue, we note that "[a]n officer who seizes a person based only on an unsupported, inchoate hunch has acted in clear violation of a defendant's Fourth Amendment rights and, thus, has committed misconduct. Exclusion is warranted in such a circumstance." *People v Lucynski*, ___ Mich ___ (July 26, 2024) (Docket No. 165806).

15

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                                                    No. 163961

MATTHEW SCOTT DUFF,

     Defendant-Appellant.

_____

WELCH, J. (*concurring*).

I join the majority opinion in full and agree with the disposition of this case. I write separately to raise concerns about whether the current federal standard for determining if a person has been seized under the Fourth Amendment of the United States Constitution is workable or consistent with Article 1, § 11 of the 1963 Michigan Constitution.

As often happens, the arguments in this case were presented exclusively under the Fourth Amendment of the United States Constitution, which provides:

> *The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated*, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [Emphasis added.]

Under federal law, a warrantless seizure is generally presumed unreasonable and thus "presumed unconstitutional unless shown to be within one of several established exceptions." *People v Lucynski*, 509 Mich 618, 637; 983 NW2d 827 (2022). As the majority and dissenting opinions in this case each recognize, a *seizure* under the Fourth

Amendment occurs when government agents use either *physical force* or a *show of authority* to restrain the liberties of a person.

The current test under federal law purports to be an *objective* standard asking whether, under the totality of the circumstances, a *reasonable person* would have believed they were free to leave, free to decline a request from law enforcement, or free to terminate the interaction with law enforcement. See *California v Hodari D*, 499 US 621, 627-628; 111 SCt 1547; 113 L Ed 2d 690 (1991); *Michigan v Chesternut*, 486 US 567, 572-573; 108 S Ct 1975; 100 L Ed 2d 565 (1988); *Florida v Bostick*, 501 US 429, 439; 111 S Ct 2382; 115 L Ed 2d 389 (1991). Although it has evolved over time, origins of this test are rooted in the plurality opinion authored by Justice Stewart in *United States v Mendenhall*, 446 US 544, 553-554; 100 S Ct 1870; 64 L Ed 2d 497 (1980), which was adopted by the United States Supreme Court in *Florida v Royer*, 460 US 491; 103 S Ct 1319; 75 L Ed 2d 229 (1983).

There has been continuous debate about what a *reasonable person* would think during interactions with law enforcement, as well as debate about what actions constitute an adequate showing of physical force or government authority to give rise to a seizure. Numerous divided decisions of this Court, including the decision in this case, provide illustrious examples of how such debates have unfolded. See *People v Hicks*, __ Mich __ (July 26, 2024) (Docket No. 165663); *People v Lucynski* 509 Mich 618; 983 NW2d 827 (2023); *People v Jenkins*, 472 Mich 26; 691 NW2d 759 (2005); *People v Mamon*, 435 Mich 1; 457 NW2d 623 (1990). An underlying theme of the disagreements among jurists in these cases is whether a reasonable person is more analogous to the average law-abiding civilian or some judicially crafted ideal of such a person. Such themes influence how jurists

2

opine, often in the abstract, how a reasonable person would interpret or react to a show of authority or force by law enforcement. But idealistic judicial models are subject to becoming outdated and may not reflect reality.

Academics have opined for decades that most people (who are presumably reasonable individuals) do not feel free to leave or terminate encounters with law enforcement. And yet, federal courts have reached the opposite conclusion. Regardless of its merits, "[t]he most frequent criticism of the consent search cases is that the Supreme Court is unaware of the realities on the street, where any time a police officer requests something of a civilian, however innocently and politely, the civilian will feel a large amount of compulsion to comply." Simmons, *Not "Voluntary" but Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine*, 80 Ind L J 773, 800-801 (2005).

One early observation about the *Mendenhall-Royer* test was that a "literal application . . . would result in virtually all police-citizen encounters being characterized as seizures . . . ." Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining when Fourth Amendment Activity Begins*, 79 J Crim L & Criminology 437, 439 (Summer 1988). Professor Edwin J. Butterfoss deemed the standard "unworkable because the outcomes of cases turn on subtle factual distinctions unrelated to an individual's actual freedom to end an encounter with a police officer, making it difficult for police officers to apply the standard in the field and adjust their conduct accordingly," and because the test "provides insufficient protection for an individual's rights by failing to consider the

3

purpose of the encounter."[1]  *Id*. at 442.  In other words, Professor Butterfoss found the *Mendenhall-Royer* test to be less-than-ideal for both the police and those who are stopped by the police.

Subsequent empirical studies indicate that most reasonable people would not feel free to leave or disengage in many situations involving law enforcement, despite the United States Supreme Court finding that they would.  In one study, data demonstrated that while 70.7% of respondents considered an encounter with a security officer to be consensual, 47.6% percent of the respondents did not believe they had the right to walk away, ignore the request, or terminate the encounter.  Smith et al, *Testing Judicial Assumption of the*

---

[1] Although it has never been adopted, Professor Butterfoss proposed the following alternative:

> [A] per se rule based on the purpose for which the officer initiates the encounter with the citizen.  If a police officer initiates contact with an individual to investigate that individual for complicity in criminal activity, the officer should be required to demonstrate an objective basis—reasonable suspicion—for doing so.  Such a standard is easily applied and strikes the proper balance between the protection required for citizens and the need to avoid burdening police unnecessarily.  Although such a test is unlikely to be adopted by the present Supreme Court, it is a standard that state courts should consider in analyzing encounters between police and citizens of the state. [*Bright Line Seizures*, 79 J Crim L & Criminology at 442.]

Such a test would be easier to apply than the existing *Mendenhall-Royer* framework in situations where law enforcement officers intend to investigate suspected criminal activity or to restrict a person's liberties.  This would also restore some legal relevance to the subjective views and intentions of law enforcement officers when performing a Fourth Amendment seizure analysis, especially when such intentions are not conveyed to a suspect.  Although I cannot say whether such a test *should* be adopted, it would make a case like this one uncontroversial.  The current *Mendenhall-Royer* framework prevents the Court from giving legal weight to Deputy Jason Pence's testimony that he intended to investigate allegedly "suspicious" activity, that he did not consider defendant to be free to leave, and that if defendant had attempted to leave, the Deputy "would have then activated [his] emergency lights and sirens."

*"Consensual" Encounter: An Experimental Study*, 14 Fla Coastal L Rev 285, 305-306 (Winter 2013). Of those who did not believe they could leave, 68.4% also viewed the encounter as consensual. *Id*. at 306. Another analysis of 406 individuals surveyed in the Boston area concluded that "[e]ven those people who know that they have a right to leave responded that they would not feel free to leave" when approached and questioned by law enforcement officers on a public street or on a bus. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J Crim L & Criminology 51, 52-53, 73 (Fall 2008). Female respondents and people under the age of 25 reported not feeling free to leave at greater numbers than the average. *Id*. at 73. Risks of sample bias aside, see *id*. at 72-73, Mr. David K. Kessler's conclusions are noteworthy because the fact pattern used in the survey was analogous to situations in which the United States Supreme Court had held that a reasonable person *would* feel free to leave or decline to talk to police.[2]

As Chief Justice CLEMENT acknowledges, historically, the *Mendenhall-Royer* test has not been applied by courts in a literal sense. This, in my view, begs the question of whether the established reasonable person test is in actuality a workable objective standard for determining whether a person has been "seized" under the Fourth Amendment. I worry the *Mendenhall-Royer* test is approaching impracticability as it becomes increasingly convoluted and exception ridden.[3]

---

[2] See *Chesternut*, 486 US 567; *Bostick*, 501 US 429; *United States v Drayton*, 536 US 194; 122 S Ct 2105; 153 L Ed 2d 242 (2002); *Muehler v Mena*, 544 US 93; 125 S Ct 1465; 161 L Ed 2d 299 (2005).

[3] For example, some federal decisions have gone so far as to suggest that social pressure to cooperate with law enforcement requests is legally irrelevant, and instead a person "is only seized when she submits to an officer's display of authority." *United States v Easley*, 911 F3d 1074, 1080 (CA 10, 2018). If social pressure or norms influence how a reasonable

person perceives a police officer's words or conduct, then I question how such pressures or norms are legally irrelevant. That such views have become the status quo, as Justice Viviano notes, does not make them logical or consistent with an objective test designed to assess what a *reasonable person* would do or think during an interaction with law enforcement. I also note that a requirement that a seizure include a submission to authority was not derived from *Mendenhall* or *Royer*, nor from any other case preceding those decisions. Such legal requirements are of a more recent vintage. A divided United States Supreme Court appeared to adopt a *submission* standard for *a show of authority without application of physical force* in *Hodari D* when faced with the question of whether words of authority coupled with a police chase were enough to give rise to a seizure. See *Hodari D*, 499 US at 626 ("The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not."); *id*. ("An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority.").

As the dissenting justices in *Hodari D* opined, any holding that a seizure has not occurred despite "the fact that the [*Mendenhall* reasonable person] standard has been met" is inconsistent with *Immigration & Naturalization Serv v Delgado*, 466 US 210, 215; 104 S Ct 1758; 80 L Ed 2d 247 (1984), *Royer*, 460 US 491, and *Chesternut*, 486 US at 573. See *Hodari D*, 499 US at 637-642 (Stevens, J. dissenting). Over a decade later, in *Brendlin v California*, 551 US 249, 254; 127 S Ct 2400; 168 L Ed 2d 132 (2007), the Court cited *Hodari D* to support the notion that, in the absence of submission to a show of authority, "there is at most an attempted seizure, so far as the Fourth Amendment is concerned." The *Brendlin* opinion reiterated, however, that it is the *Mendenhall-Royer* test that controls questions of whether a seizure occurred "[w]hen the actions of the police d[id] not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority t[ook] the form of passive acquiescence[.]" *Id*. at 255.

These competing views are difficult to reconcile, especially considering the holding in *Brendlin* that a passenger in a vehicle that was stopped by law enforcement was seized along with the driver despite the lack of any evidence that the passenger (as opposed to the driver) did anything to submit to the governmental exercise of force or show of authority. *See id*. at 256, 263. Precedent from the United States Supreme Court is obviously binding, and I read *Brendlin* as stating that the *Mendenhall-Royer* test does not require *evidence of submission to a show of authority* before a seizure occurs in most circumstances, even if *Hodari* arguably reached a different conclusion under a different set of facts that included attempted flight from police officers. But I also question whether a broad requirement to submit to governmental use of force or show of authority is consistent with the *Mendenhall-Royer* test's focus on the views of a reasonable person.

6

Given this reality, there may be " 'compelling reasons' to impose a different interpretation" of Michigan's analogous protections under Const 1963, art 1, § 11. *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991). This Court has observed that there is "no evidence that those who later framed and adopted the 1963 Constitution had any intention of expanding the protections provided under Michigan's search and seizure provision beyond that secured by the Fourth Amendment of the federal constitution." *Id*. at 27, citing *People v Nash*, 418 Mich 196; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.). But despite the broad proclamations in *Collins*, in *Sitz v Dep't of State Police*, 443 Mich 744, 764-779; 506 NW2d 209 (1993), this Court held that warrantless, suspicionless sobriety checkpoints on Michigan highways violated Const 1963, art 1, § 11. This was after the same checkpoints were deemed lawful under the Fourth Amendment in the same case by the United States Supreme Court. See *Mich Dep't of State Police v Sitz*, 496 US 444; 110 S Ct 2481; 110 L Ed 2d 412 (1990). While it is rare for this Court to read Const 1963, art 1, § 11 as providing greater protections than the Fourth Amendment of the United States Constitution, it is not unprecedented.[4]

Returning to *Mendenhall-Royer*, I question whether the framers of Michigan's 1963 Constitution or the electorate who ratified it could have foreseen the dramatic changes in how the United States Supreme Court would interpret and apply the Fourth Amendment

---

[4] Michigan has not been the only state to diverge from the United States Supreme's Fourth Amendment jurisprudence on state constitutional grounds. See, e.g., Gorman, *Survey: State Search and Seizure Analogs*, 77 Miss L J 417 (2007) (surveying state court decisions). For example, the Delaware Supreme Court has rejected *Hodari D* as a matter of state constitutional law. See *Jones v State*, 745 A2d 856, 862-868 (Del, 1999) (holding that the defendant was "seized" when the police officer ordered him to stop and remove his hands from his coat).

7

since the 1960s.[5]  I also find it noteworthy that the *Mendenhall-Royer* test was adopted years after Michigan's current Constitution was adopted, and thus could not have been considered by the framers or the electorate.  An important question remains: would a different test for determining whether a person has been seized be more consistent with Const 1963, art 1, § 11 than the current understanding of the *Mendenhall-Royer* framework?

Elizabeth M. Welch

---

[5] Like this Court, the United States Supreme Court's understanding and application of constitutional and statutory law is not static.  As an illustration that is not limited to constitutional decisions, since 1961, the United States Supreme Court has overruled more than 140 of its own decisions.  See United States Congress, Constitution Annotated, *Table of Supreme Court Decisions Overruled by Subsequent Decisions* <https://constitution.congress.gov/resources/decisions-overruled/> (accessed July 5, 2024).

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                       No. 163961

MATTHEW SCOTT DUFF,

        Defendant-Appellant.

_____

CLEMENT, C.J. (*dissenting*).

The line between a consensual encounter and a seizure under the Fourth Amendment is often exceedingly subtle, and drawing that line is rarely an easy task. But on balance here, I agree with Justice VIVIANO that the officers did not seize defendant, Matthew S. Duff, before Deputy Jason Pence saw signs that defendant was intoxicated. I write separately to discuss what I believe to be the proper understanding of the *Mendenhall*[1] free-to-leave test and to explain why I agree with the majority's decision to overrule the Court of Appeal's opinion in *People v Anthony*, 327 Mich App 24; 932 NW2d 202 (2019).

I

As the majority notes, a seizure under the Fourth Amendment occurs when the police use either " 'physical force' or a 'show of authority' that 'in some way restrains the liberty' of the person." *Torres v Madrid*, 592 US 306, 311; 141 S Ct 989; 209 L Ed 2d 190 (2021) (citation and brackets omitted); *People v Lucynski*, 509 Mich 618, 635; 983 NW2d

_____

[1] *United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980).

827 (2022).[2]  To decide whether police have made a show of authority that in some way restrains a person's liberty, the United States Supreme Court adopted the *Mendenhall* free-to-leave test, which provides that "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *California v Hodari D*, 499 US 621, 627-628; 111 S Ct 1547; 113 L Ed 2d 690 (1991), quoting *United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980) (quotation marks omitted).  Applying the *Mendenhall* free-to-leave test, courts thus often say that police have seized a person by a show of authority if a reasonable person in that person's position would not have "felt free" to leave or—if the person had no desire to leave for reasons unrelated to the police's presence—if a reasonable person would not have "felt free" to decline a police officer's requests or otherwise terminate the encounter.  See, e.g., *Lucynski*, 509 Mich at 638 ("We must therefore decide when a reasonable person in defendant's shoes would either (1) have not felt free to leave or (2) have ceased to feel free to decline [the police officer's] requests or otherwise terminate the encounter."); *Florida v Bostick*, 501 US 429, 434; 111 S Ct 2382; 115 L Ed 2d 389 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free to disregard the police and go about his business,

---

[2] In his brief in support of his motion to suppress evidence, defendant noted that he was challenging the officers' conduct solely on the basis of the United States Constitution.  So here, this Court decides whether the officers seized defendant only under the Fourth Amendment.  Even so, as the majority notes, we generally interpret Const 1963, art 1, § 11 coextensively with the Fourth Amendment, "absent 'compelling reason' to impose a different interpretation."  *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991).

the encounter is consensual and no reasonable suspicion is required.") (quotation marks and citation omitted).

Despite the frequent emphasis on how a reasonable person would *feel*, it is important not to read this too literally in my view. As the United States Supreme Court has clarified in later opinions, the question is not how the presence of a police officer would have made a reasonable person feel, but what the officer's words and conduct would have *communicated* to a reasonable person. See, e.g., *Hodari D*, 499 US at 628 ("*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."). Put otherwise, the question is whether a reasonable person would have understood the officer's words or conduct as communicating "you are not free to leave," "stop," "halt," or "you must speak with me." See *Commonwealth v Matta*, 483 Mass 357, 362 n 5; 133 NE3d 258 (2019) ("Under this approach, courts still look to the 'totality of the circumstances' as interpreted through the 'reasonable person,' but with special attention paid to the officer's words and actions, and the message conveyed therein."); *State v Jones*, 172 NH 774, 777; 235 A3d 119 (2020) ("The analysis thus focuses on whether an officer objectively communicates by means of physical force or a show of authority that he or she is restraining the person's liberty.").[3]

---

[3] Although I believe the focus should be on what the officers' words and conduct communicate, I do not mean to suggest that I believe the circumstances during which an encounter occurs are irrelevant. The message that words and conduct convey will no doubt vary depending on the setting in which an encounter occurs. See *Michigan v Chesternut*, 486 US 567, 573; 108 S Ct 1975; 100 L Ed 2d 565 (1988) ("Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary,

3

Framing the question this way harmonizes the *Mendenhall* free-to-leave test with this Court's and the United States Supreme Court's consistent reminder that not all encounters between the police and citizens are seizures. See *People v Ward*, 491 Mich 932, 932 (2012), citing *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983), and *People v Jenkins*, 472 Mich 26; 691 NW2d 759 (2005). Empirical evidence suggests that most people rarely, if ever, feel free to walk away when the police initiate an encounter with them. See Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining when Fourth Amendment Activity Begins*, 79 J Crim L & Criminology 437, 439 (Summer 1988); Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J Crim L & Criminology 51, 73 (Fall 2008); Smith, Dolgoff, & Speer, *Testing Judicial Assumption of the "Consensual" Encounter: An Experimental Study*, 14 Fla Coastal L Rev. 285, 304-305 (Winter 2013) (stating that, among participants in a "consensual" police encounter, the majority did not feel free to leave or did not know of right to leave). So if the question were how the presence of a police officer would have made a reasonable person feel, then in reality, arguably every encounter between the police and a citizen would be a seizure. Yet as this Court and the United States Supreme Court have made clear, the Fourth Amendment does not stretch so far.

With that understanding of the *Mendenhall* free-to-leave test, the issue here is whether the officers' conduct, considered collectively, would have communicated to a reasonable person in defendant's position that he was not free to go about his business or

---

not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.").

4

ignore the officers—not whether their presence would have made a reasonable person *feel* as if he must cooperate.

II

When police box in a parked car so that it has no way to move or drive away, this Court and others have suggested that this alone may communicate to a reasonable occupant that he is not free to ignore police and go about his business. See *Lucynski*, 509 Mich at 643 ("Under the totality of the circumstances, we hold that defendant was seized at the moment Robinson, in his marked police vehicle, blocked defendant's car, resulting in no means for defendant to exit the single-lane driveway."); *United States v See*, 574 F3d 309, 313 (CA 6, 2009) ("Given the fact that [the officer] blocked See's car with his marked patrol car, a reasonable person in See's position would not have felt free to leave."); *United States v Gross*, 662 F3d 393, 399-400 (CA 6, 2011) (citing *See* and holding that a seizure occurred when the officer boxed in the driver's parked car so that the driver could not leave his parking spot); *United States v Jones*, 678 F3d 293, 301-302 (CA 4, 2012) (collecting similar cases). In other words, if police officers deprive the occupant of a parked car of all means to maneuver or drive away, this alone strongly suggests that the police officers have seized the occupant.

This Court unanimously agrees that the officers here did not deprive defendant of all means to maneuver his car or drive away out of the parking lot. It is true that defendant could not drive forward because he was facing the grass. And it is true that defendant could not back out of his spot while turning to the left or back straight out without striking the officers' patrol vehicle. But defendant could have backed out of the parking spot by

5

backing out while turning his steering wheel to the right. And considering that the patrol vehicle was parked 10 feet away from defendant's car, there is nothing in the record suggesting that defendant would have had to maneuver around the patrol vehicle while doing so. Likewise, there is nothing in the record showing that defendant would have had difficulty driving around the patrol vehicle to reach the parking lot's exit once he had backed out of the spot. So, as it stands, the record shows that the officers only partially restricted defendant's ability to maneuver his car and drive away.

Although the officers only partially restricted defendant's ability to maneuver his car or drive away, I agree with the majority and Justice VIVIANO that this does not automatically mean this was a consensual encounter. As this Court and the United States Supreme Court have held, when considering how a reasonable person would have understood an officer's words or conduct, courts must consider the officer's words and conduct as a whole, while also considering the setting in which an encounter occurs. See *Michigan v Chesternut*, 486 US 567, 573; 108 S Ct 1975; 100 L Ed 2d 565 (1988); *Lucynski*, 509 Mich at 635. So even if a partial restriction alone typically will not amount to a seizure, courts must still consider the remaining circumstances of the encounter and weigh whether these circumstances, plus the partial restriction, would have collectively conveyed a coercive message to a reasonable person. See *United States v Carr*, 674 F3d 570, 573 (CA 6, 2012) ("As the concurrence in *See* suggested, *unless there is other coercive behavior*, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave.") (emphasis added); *United States v Kim*, 25 F3d 1426, 1431 (CA 9, 1994) (noting fact that the police officer "partially blocked [the

6

defendant's] egress with his automobile informs but does not alter our conclusion" that no seizure occurred).

Consequently, I agree with the majority that the Court of Appeals' decision in *Anthony* must be overruled to the extent the panel suggested that a partial blockage of a parked car is irrelevant to deciding whether a seizure by show of authority occurred. See *Anthony*, 327 Mich App at 40 ("[O]nly if officers completely block a person's parked vehicle with a police vehicle is the person seized."). Though the *Anthony* panel may have simply misspoken, I agree that it is important for this Court to correct legally inaccurate propositions in published opinions of the Court of Appeals, lest other courts or litigants be misled.

That said, the question that remains is whether the following would have communicated to a reasonable person in defendant's position that he was not free to go about his business and ignore the officers: (1) at 10:00 p.m., officers parked their patrol vehicle at a 45-degree angle 10 feet behind defendant's car; (2) the officers shined the patrol vehicle's headlights and spotlight at defendant's car; (3) one officer approached the driver's side of defendant's car while the other approached the passenger's side; and (4) at least the officer who approached the passenger side carried a flashlight. This is certainly a close case, but on balance, I agree with Justice VIVIANO that this would not have communicated to a reasonable person in defendant's position that he was not free to leave or to ignore the officers.

First, in my view, the position of the officers' patrol vehicle only minimally restricted defendant's ability to drive his car out of the parking lot. As mentioned, defendant could have backed out of the parking spot by backing out while turning his

7

steering wheel to the right—the normal way people back out of parking spaces. And again, there is no evidence that defendant would have had difficulty maneuvering around the patrol vehicle while doing so, or that the patrol vehicle was blocking the exit to the parking lot. The majority concludes that, based on the patrol vehicle's position, defendant would have had to drive over the yellow lines marking parking spaces to exit the parking lot. But even if the majority is correct that a reasonable person would be fearful about driving over the yellow lines with the police watching, as Justice VIVIANO notes, the record does not support the majority's conclusion that the position of the patrol vehicle would have forced defendant to drive over the yellow lines.

Second, I agree with Justice VIVIANO that the remaining conduct would not have communicated a coercive message to a reasonable person, even when considered along with the way in which the officers parked. The officers' use of the patrol vehicle's spotlight and their manner of approach would certainly have communicated to a reasonable person that they wished to speak. But in my view, this conduct was not the equivalent of a command to "halt" or a demand that defendant cooperate, and neither was the officers' use of the patrol vehicle's headlights or the one officer's use of a flashlight. Rather, I agree with Justice VIVIANO that a reasonable person in defendant's position would have understood that the officers' use of these devices was merely a means to provide light during an encounter in the dark. I further agree with Justice VIVIANO that a reasonable person would have understood that the officers' manner of approach was a measure for officer safety, not a coercive command.

8

## III

In sum, the proper understanding of the *Mendenhall* free-to-leave test, in my view, is whether officers' words and conduct, considered collectively, would have communicated to a reasonable person in the defendant's position that he was not free to go about his business or ignore police. Applying that understanding here, I do not believe the officers' conduct would have communicated this to a reasonable person in defendant's position. I therefore disagree with the majority's conclusion that officers seized defendant after they parked their patrol vehicle and began approaching defendant's car. I respectfully dissent. I would have affirmed the judgment of the Court of Appeals.

Elizabeth T. Clement

9

# S T A T E  O F  M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                             No. 163961

MATTHEW SCOTT DUFF,

      Defendant-Appellant.

_____

VIVIANO, J. (*dissenting*).

## I.  INTRODUCTION

In this case, the Court continues its recent trend of recharacterizing routine police-citizen interactions as constitutional violations.  Michigan now will be the only jurisdiction in the United States where police officers are not permitted to approach suspects sitting in vehicles at night to investigate suspected criminal activity.  But "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."  *United States v Mendenhall*, 446 US 544, 553-554; 100 S Ct 1870; 64 L Ed 2d 497 (1980) (opinion by Stewart, J.) (quotation marks and citation omitted).

The majority turns the *Mendenhall-Royer* "free to leave" test on its head.  Its decision-making in this and other recent cases will make the work of policing more dangerous and the public less safe from criminal activity.  I would instead follow the

binding decisions of the United States Supreme Court and this Court, and the overwhelming weight of authority from the lower federal courts and other state courts. Under those precedents, it is clear that defendant was not seized when the police officers positioned their patrol vehicle behind defendant's vehicle, partially obstructing his egress, activated their spotlight, and approached defendant's vehicle.

## II.  SUMMARY OF FACTS

The facts are straightforward and undisputed: Oakland County Sheriff's Deputy Jason Pence and his partner were on routine patrol on a Sunday evening at approximately 10:00 p.m. when Deputy Pence observed a vehicle parked in the otherwise empty parking lot of an elementary school.  Deputy Pence could see that the suspect vehicle was occupied because its engine was running and its interior lights were on.  He pulled into the parking lot to investigate further and parked his vehicle at a 45-degree angle pointing toward the driver-side rear bumper of the suspect vehicle, about 10 feet away.  He then activated his spotlight and pointed it at the suspect vehicle for his and his partner's safety.  The deputy's vehicle did not block the egress of the suspect vehicle—if defendant wished to leave, although he could not pull forward without driving off the pavement, he could have simply backed out of his parking space at an angle by turning his wheel.  The deputy and his partner then approached on either side of defendant's vehicle.

Equally important are facts that are not present: Deputy Pence did not activate his siren or overhead lights; he did not drive his vehicle or approach defendant in an aggressive manner; there were only two police officers present; they did not draw their weapons or

2

point them at defendant; the officers did not give any commands or speak in a loud voice; and they did not completely block defendant's egress or prevent him from leaving.

As the officers approached, Deputy Pence observed defendant through his open window and could see visible signs of intoxication. As he spoke to defendant, the deputy detected the odor of alcohol and observed that defendant had watery and bloodshot eyes and was slurring his words. After further investigation, defendant was arrested and consented to a blood draw. The results revealed a blood-alcohol content of .339%, more than four times the legal limit. Defendant was later charged with operating while intoxicated, third offense, under MCL 257.625.

### III. LEGAL ANALYSIS

The only question before us is whether defendant was illegally seized in violation of the Fourth Amendment at the initial stage of this encounter, i.e., when the deputies parked their patrol car near defendant's vehicle, put on their spotlight, and initially approached his vehicle.[1] As the majority correctly notes, not all interactions between a police officer and a citizen involve a seizure. Instead, a seizure only occurs when a police officer restrains the liberty of a citizen by means of physical force or by a show of authority

---

[1] The majority opinion remands this case to the Court of Appeals to determine whether the trial court correctly concluded that the deputies did not have reasonable suspicion to conduct a stop under *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), at this initial stage of the encounter (i.e., before Deputy Pence observed defendant through his open window and observed visible signs of intoxication). If there was reasonable suspicion at the beginning of the encounter, of course, the seizure issue becomes moot. Once Deputy Pence observed defendant's condition, it is clear that "[he] had reasonable suspicion that defendant had operated a vehicle while intoxicated, and could briefly detain defendant for further investigation." *People v Duff*, unpublished per curiam opinion of the Court of Appeals, issued November 23, 2021 (Docket No. 354406), p 4. Defendant has not challenged this finding on appeal.

3

to which the individual acquiesces or submits. See *Michigan v Chesternut*, 486 US 567, 573; 108 S Ct 1975; 100 L Ed 2d 565 (1988); *California v Hodari D*, 499 US 621, 624-628; 111 S Ct 1547; 113 L Ed 2d 690 (1991). The defendant "bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he . . . was seized)[.]" *United States v Hernandez*, 847 F3d 1257, 1263 (CA 10, 2017) (quotation marks and citation omitted).[2]

Again, as the majority recognizes, "[t]he Fourth Amendment is not implicated when a law enforcement officer merely approaches an individual and directs questions to that person." *People v Ward*, 491 Mich 932, 932 (2012), citing *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983), and *People v Jenkins*, 472 Mich 26; 691 NW2d 759 (2005). Rather, "the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Chesternut*, 486 US at 573 (citation omitted). The majority also cites the correct standard for cases like the present one—i.e., cases in which the defendant apparently "has no desire to leave"—as not whether a reasonable person would feel "free to leave" but instead "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v Bostick*, 501 US 429, 435, 436, 439; 111 S Ct 2382; 115 L Ed 2d 389 (1991).

---

[2] But "[i]f the defendant meets his burden of establishing a warrantless seizure, the burden then shifts . . . [and] [t]he Government must establish the warrantless seizure was reasonable." *United States v Shrum*, 908 F3d 1219, 1229 (CA 10, 2018).

A.  THE MAJORITY'S "FROWNED UPON" TEST FOR A SEIZURE HAS NO BASIS IN FACT, LAW, OR THE RULES OF POLITE SOCIETY

Before analyzing the facts of this case, the majority goes to great lengths to establish a point that is not in serious doubt: completely blocking-in a suspect's vehicle is not the only way for the police to seize a person in a parked vehicle.  This should not be surprising—as already noted, to determine whether a street encounter was consensual or coerced, a court must consider all the police conduct at issue, taken as a whole, rather than focusing on particular details in isolation.  See generally *Chesternut*, 486 US at 573-574.  On the other hand, when there is no other coercive police behavior, the determination of whether a seizure occurred may come down to whether a person's parked vehicle was completely blocked-in.[3]

---

[3] See 4 LaFave, Search & Seizure (6th ed), § 9.4(a), pp 611-612 (explaining that an encounter with a person seated in a parked vehicle will likely become a seizure if the officer engages in "police action one would not expect if the encounter was between two private citizens—[such as by] boxing the car in"); see also *People v Lucynski*, 509 Mich 618, 643; 983 NW2d 827 (2022), citing § 9.4(a) of Professor Wayne LaFave's treatise for the same principle; *Lucynski*, 509 Mich at 644 n 13 (citing cases involving similar facts).  Read in context, that is all that the Court of Appeals panel meant in *People v Anthony*, 327 Mich App 24, 40; 932 NW2d 202 (2019), when it stated, "[O]nly if officers completely block a person's parked vehicle with a police vehicle is the person seized."  Thus, overruling *Anthony* is entirely unnecessary.  Moreover, even assuming that case was wrongly decided, the panel in *Duff* only cited *Anthony* twice: once to note that it found instructive a passage from *United States v Carr*, 674 F3d 570 (CA 6, 2012), that was "cited approving [sic] in [*Anthony*]," *Duff*, unpub op at 4, and once for a brief parenthetical on an unrelated point, *id*.  In any event, the Court of Appeals panel below certainly did not limit its analysis to consideration of whether defendant's vehicle was boxed-in.  Instead, after noting that the position of the police vehicle alone did not turn the encounter into a seizure, the panel considered whether there was other coercive behavior that turned this encounter into a seizure.  *Id*.  I have not found any court, besides the majority here, that has had difficulty applying *Anthony*.  For these reasons, I would reject the Court of Appeals dissenting judge's gratuitous invitation to overrule it.

5

Next, without citing any authority, the majority concocts a new factor for determining whether a seizure occurred when it states that, although it would not be a misdemeanor or traffic infraction "driving over the painted spaces of a parking lot . . . , a reasonable driver would likely assume that driving over them is either explicitly prohibited or at least frowned upon, especially while driving under direct police surveillance" and that ["t]his social expectation is relevant . . . ." *Ante* at 11 n 5. It is hard to know where to begin. Putting aside the questionable notion that legal conduct that is "explicitly prohibited" by a private entity may have a bearing on the Fourth Amendment analysis, see *ante* at 11 n 5,[4] the lowest common denominator of the majority's new "frowned upon" factor seems to be this: any time a police vehicle is positioned so that a person can only leave by doing something that is "at least frowned upon," that is a factor tending to show a seizure. But the majority provides no support for its assertion that driving over painted lines of parking spaces is frowned upon by polite society and, to the contrary, at least one notable authority on etiquette appears to take the view that it is not. See Post, *Emily Post's Etiquette* (Harper Collins, 2004), p 27 ("[D]o use extra caution if driving through an open space in a row to get to the other side; it's hard for other drivers to see you coming through."). In any event, we will have to wait until future cases to identify the precise contours of this extremely vague standard.[5]

---

[4] In another case decided this term, a majority of the Court questioned "whether a private entity's trespassing policy could render lawful an otherwise unlawful detention." *People v Prude*, ___ Mich ___, ___, n 11; ___ NW2d ___ (July 5, 2024) (Docket No. 165664); slip op at 11 n 11. It would seem equally debatable whether a private entity's parking-lot policy could render unlawful an otherwise lawful detention.

[5] For instance, does a defendant need to show the disapproval of an actual person like an expert on etiquette? Or just point to some vague, purported societal norm like the majority

6

Additionally, why does it matter that the "frowned upon" maneuver is done under "direct police surveillance"? How can this be squared with the Supreme Court's holding that "the 'reasonable person' test presupposes an *innocent* person"? See *Bostick*, 501 US at 438. And how can the majority's new-found social expectation not to drive over a parking space be relevant when courts across the country have repeatedly emphasized that "a police-citizen encounter does not become a seizure simply because citizens may feel an inherent social pressure to cooperate with the police." *People v Melton*, 910 P2d 672, 676 (Colo, 1996). See also *United States v Baker*, 290 F3d 1276, 1278 (CA 11, 2002) ("The societal pressure to stop and speak with law enforcement is not a sufficient restraint of liberty to raise the interaction to a level that requires constitutional protection.").[6]

---

does here? Or is it now left to the sensibility of individual judges, without any objective standards to guide their decisions (or to guide law enforcement practices going forward)?

[6] See also *United States v Reyes*, 697 F Supp 513, 516 (D DC 1988) ("It seems unwise to ignore the reality that such pressure is inherent in any encounter initiated by police. But the Court's function is not to eradicate such pressure; rather, it should only assure that the officer did not add to it in a manner thought to be offensive by a reasonable person, recognizing that a reasonable person is often willing to co-operate with law enforcement officials in apprehending criminals or preventing crime."), citing *Gomez v Turner*, 217 US App DC 281, 289; 672 F2d 134 (1982), and 3 LaFave, *Search and Seizure* (2d ed), § 9.2(h), pp 410-415. As explained by Professor LaFave,

> [i]mplicit in the introduction of the [officer] and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond. Few will feel that they can walk away or refuse to answer. This, it is submitted, is an accurate characterization of the great majority of situations in which an officer approaches a pedestrian and seeks an explanation for his activities or even identification. Thus, if the ultimate issue [of whether a seizure occurred] is perceived as being whether the suspect would feel free to walk away, then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The *Mendenhall-Royer* standard should not be given such a literal reading as to produce such a result. [4 LaFave, Search & Seizure (6th ed), § 9.4(a),

7

In addition to its legal flaws, the majority proceeds on a faulty factual premise. The majority correctly concludes that the trial court's finding on remand that defendant's vehicle was completely blocked-in was clearly erroneous because it is not supported by the record. But then the majority makes its own clearly erroneous finding when it asserts that defendant's vehicle was blocked-in by the police car such that he could only leave by driving over the painted lines of an empty parking space. The trial court never made that finding, and regardless, I could locate no record evidence to support it.[7]

> pp 594-595 (quotation marks and citation omitted; first alteration in original).]

See also *Lawrence v United States*, 566 A2d 57, 61 (DC App, 1989) ("Professor LaFave's approach is consistent with the applicable case law."); *Commonwealth v Mathis*, 643 Pa 351, 374-375; 173 A3d 699 (2017) ("[A]ll interactions with law enforcement may be viewed, to some degree, as a show of authority to which people usually accede. However, the free-to-leave test is not to be employed in such a literal manner so as to require application of Fourth Amendment exclusionary remedies to all police encounters."); *People v Luedemann*, 222 Ill 2d 530, 556; 857 NE2d 187 (2006) (adopting Professor LaFave's conclusion that " '[t]he *Mendenhall-Royer* standard should not be given such a literal reading' " because doing so would render virtually all police-citizen encounters a Fourth Amendment seizure) (citation omitted); *State v Daniel*, 12 SW3d 420, 427 (Tenn, 2000) (holding that the "encounter did not become a seizure simply because [the defendant] may have felt inherent social pressure to cooperate"); *State v Backstrand*, 354 Or 392, 402; 313 P3d 1084 (2013) ("[T]he fact that an individual—for reasons personal to that individual—feels obligated to cooperate with the officer simply because of the officer's status is not the form or source of coercion that is of constitutional concern."); *People v Walters*, 249 P3d 805, 809 (Colo, 2011) (observing that (1) the mere fact that an officer "identifies himself as a police officer does not convert the encounter into an investigatory stop," and (2) nor "does the 'inherent social pressure to cooperate with the police' elevate the encounter into a seizure") (citation omitted).

[7] On remand, the trial court conducted a status hearing on March 4, 2020, to discuss the parties' respective positions on the issue of when defendant was seized for Fourth Amendment purposes. During the hearing, the prosecutor incorrectly summarized Deputy Pence's testimony from a previous hearing, stating that Pence had testified that defendant "could have pulled out without an issue *over the parking spots* . . . ." (Emphasis added.) But Deputy Pence never made that statement. Instead, he testified that if defendant turned

8

Instead, the record evidence shows that if defendant wished to leave, he could have backed out of his parking space by simply backing up and turning his wheel (i.e., by engaging in a maneuver that every driver is taught during driver's training and that experienced drivers routinely execute when they go to the grocery store).[8] It is also important to note that the encounter took place in a large parking lot, where there was room for two cars to pass, and not in a confined space. In such circumstances, it is clear that defendant was not physically restrained from departing. See *People v Cascio*, 932 P2d 1381, 1387-1388 (Colo, 1997) (concluding that there was no seizure where the deputies' patrol car was parked approximately 10 to 20 feet away from the defendants' vehicle, the defendants could have left "by maneuvering their van in a manner akin to parallel parking," and the totality of the circumstances did not support a finding that it was an investigatory stop); *United States v Kim*, 25 F3d 1426, 1430-1431 (CA 9, 1994) (finding that no seizure occurred even though the federal agent parked his vehicle so as to partially block the defendant's egress); *United States v Douglass*, 467 F3d 621, 622-624 (CA 7, 2006)

his wheel as he was backing out, he could have cleared the police cruiser and pulled around it to exit the parking lot. One of the maxims of criminal law is that the attorneys' statements are not evidence. See *People v Bahoda*, 448 Mich 261, 281 n 38; 531 NW2d 659 (1995) (discussing a jury instruction that "[t]he lawyers' statements and arguments are not evidence"). Thus, an incorrect description of a witness's testimony by an attorney is no substitute for record evidence or the trial court's factual findings.

[8] Rather than refute this conclusion with evidence from the record, the majority creates its own facts and concludes that defendant would have needed "to make a sharp backward turn to leave the area at a time when his vision was impaired by lights shining into his vehicle . . . ." *Ante* at 12. But the officers never testified that defendant's vision was impaired, and defendant never testified at all. Moreover, the dashcam video upon which the majority relies clearly shows that the spotlight was directed at the left-rear quarter panel of defendant's vehicle, not directly at the driver. And in any event, defendant would have needed to look *away from* the spotlight to back out of his parking spot.

9

(concluding that no seizure occurred where a single squad car was parked 15 to 20 feet from the defendant's vehicle, with the cars facing each other "nose-to-nose").[9]

As these authorities make clear, and the Court of Appeals majority correctly found, "the position of Deputy Pence's patrol vehicle alone did not turn this encounter into a seizure[.]" *People v Duff*, unpublished per curiam opinion of the Court of Appeals, issued November 23, 2021 (Docket No. 354406) (opinion of the Court), p 4. And while the majority is correct that, in certain circumstances, a partial blockage of a defendant's egress is a factor in the analysis, the majority has utterly failed to support its new "frowned upon" test and its decision to apply the partial-blockage factor in this case.[10]

---

[9] Compare *United States v Delaney*, 446 US App DC 272, 277-279; 955 F3d 1077 (2020) (concluding that the officers' show of authority effectuated a seizure where, among other things, they parked their police cruiser three feet from the nose of the defendant's vehicle, such that the defendant would have had to execute a number of turns to leave the parking lot); *State v Jestice*, 177 Vt 513, 514; 2004 VT 65; 861 A2d 1060 (2004) (determining that an encounter was a seizure where, among other things, a uniformed officer parked his marked patrol car nose-to-nose against the defendant's vehicle). The Texas court's decision in *Johnson v State*, 414 SW3d 184 (Tex Crim App, 2013), perhaps comes closest to providing some support for the majority's holding. In that case, the court found there was a seizure based, in part, on the fact that the officer shined his spotlight at a person sitting in a parked vehicle and parked his police car in such a way as to block the person's vehicle at least partially, such that the person would have had to " 'maneuver' around the police car to drive away . . . ." *Id*. at 193. However, in reaching its conclusion that a seizure occurred, the court noted at least two additional facts that are not present in this case: the officer used a " 'loud authoritative voice' " in speaking with the defendant, and the officer demanded the defendant's identification. *Id*. And, although it did not include them in its analysis, the court also noted in its recitation of the facts that the officer "appeared evasive and argumentative" during cross-examination and that the officer testified it was "possible" that he pulled out his pistol during the encounter. *Id*. at 189. Further, the officer conceded that the defendant yielded to his authority during the encounter, *id*., which would seem to put the matter to rest.

[10] The majority provides a list of cases that purportedly found a seizure "under facts that are similar to this case." See *ante* at 13 n 6. But none of those cases is analogous to the present case, and none of them supports the majority's "frowned upon" test. Rather, the

## B. THERE WAS NO OTHER COERCIVE CONDUCT THAT WOULD TRANSFORM THIS ROUTINE POLICE ENCOUNTER INTO A SEIZURE

As I noted above, to determine whether a police encounter was consensual or coerced, a court must consider all the police conduct at issue, taken as a whole, and the setting in which the conduct occurred. See generally *Chesternut*, 486 US at 573-574. Therefore, like the majority, I will next consider "the remainder of the police conduct during the encounter . . . ."

In deciding whether a police officer's conduct amounts to a seizure under the Fourth Amendment, courts look to see if the conduct includes a coercive show of authority that goes beyond the inherent pressures of speaking with the officer.[11] Traditional hallmarks

---

majority's descriptions of these cases leave out critical facts and, as a result, misrepresent their holdings. For example, the court's decision in *United States v Smith*, 794 F3d 681 (CA 7, 2015), did not turn solely on the encounter occurring "at night" and "in a dark alley"; instead, the court considered numerous other factors including that the officer approached the defendant "with his hand on his gun" and "posed a single, accusatory question" to the defendant. *Id*. at 684-685. And in *People v Trujillo*, 773 P2d 1086, 1090 (Colo, 1989), the court found a seizure because "*three cars* approached and *blocked the path* of the two men, shining the vehicles' headlights *in their eyes*." (Emphasis added.)

[11] See *United States v Drayton*, 536 US 194, 205; 122 S Ct 2105; 153 L Ed 2d 242 (2002) ("And of more importance, bus passengers answer officers' questions and otherwise cooperate not because of coercion but because the passengers know that their participation enhances their own safety and the safety of those around them."). See also *O'Malley v Flint*, 652 F3d 662, 669 (CA 6, 2011) ("[P]olice may rely on the moral and instinctive pressures of citizens to cooperate and that a confrontation is a seizure *only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse*.") (emphasis added), citing 4 LaFave, Search & Seizure (4th ed), § 9.4; *Gomez v Turner*, 217 US App DC 281, 289; 672 F2d 134 (1982) ("[T]he presence of the officer as a figure of governmental authority does not, by itself, constitute the 'show of authority' necessary to make a reasonable person feel unfree to leave. There must be some additional conduct by the officer to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer."); *State v Anderson*, 354 Or 440, 450; 313 P3d 1113 (2013) ("For an encounter between an officer and a citizen to be a seizure under [the Oregon constitution], the officer *must add to those inherent pressures* by either physically restraining the citizen's liberty in a significant way or engaging in a

11

of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 US at 554 (opinion by Stewart, J.).  See also *United States v Drayton*, 536 US 194, 204; 122 S Ct 2105; 153 L Ed 2d 242 (2002) (concluding that there was no seizure when "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"); *Chesternut*, 486 US at 575 ("The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement.").  In the specific context of an officer approaching a parked vehicle, courts may determine whether the officer's "conduct, taken together, communicate[d] a non-verbal command" by considering whether the officer "signaled to [the defendant] to shut off the engine of the [vehicle], touched his weapon or [the defendant's] person, spoke with intimidating language or tone of voice, or tarried long." *United States v Tanguay*, 918 F3d 1, 7 (CA 1, 2019), citing *Mendenhall*, 446 US at 554 (opinion by Stewart, J.).

Here, it is undisputed that the officers' conduct did not include any of the traditional hallmarks of a seizure.  See *People v Luedemann*, 222 Ill 2d 530, 554; 857 NE2d 187 (2006) ("From the very minute the *Mendenhall* factors were created, courts [including

---

'show of authority' that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs.") (emphasis added).

*Mendenhall* itself] have used their absence to determine that seizures had not occurred."). Thus, the majority is left with only common police practices that would be unobjectionable if done by a fellow citizen or that courts have routinely found are reasonable measures taken to protect officer safety. In addition to the relative positions of the vehicles, the majority examined the following facts: (1) "Deputy Pence had activated the headlights and spotlight of the patrol car, which were shining onto defendant's parked car upon approach"; (2) "this encounter took place at 10:00 p.m. on a Sunday in an empty parking lot where, as in *Lucynski*, it would have been clear that the police were there solely to make contact with defendant"; and (3) "the police officers here exited their patrol vehicle and approached defendant's car on either side, with at least one officer shining his flashlight shining into the vehicle." These facts, even when considered as a whole, do not come close to a seizure.

It is important to remember that "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security[.]' " *Pennsylvania v Mimms*, 434 US 106, 108-109; 98 S Ct 330; 54 L Ed 2d 331 (1977) (quotation marks and citation omitted). Reasonableness, in this context, "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id*. at 109 (quotation marks and citation omitted). On the public-interest side of the ledger, courts have long recognized that the safety of police officers in the performance of their duties is of paramount importance. *Id*. at 110 ("We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty[.] 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' "), quoting *Terry v Ohio*, 392

US 1, 23; 88 S Ct 1868; 20 L Ed 2d 889 (1968).  And the Supreme Court has taken note of the particular dangers that exist when an officer approaches a person seated in an automobile.  See *Mimms*, 434 US at 110 ("And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile.").[12]  As noted above, "the 'reasonable person' test presupposes an *innocent* person."  *Bostick*, 501 US at 438.  A reasonable, innocent person would recognize that police officers will need to take certain precautions—such as using a spotlight at night—for safety purposes rather than as a show of authority.  *United States v Tavolacci*, 283 US

_____

[12] See also *United States v Michelletti*, 13 F3d 838, 844 (CA 5, 1994) ("The number of police officers killed annually in the line of duty has tripled since *Terry* was decided; the numbers of those assaulted and wounded have risen by a factor of twenty.  Surely the constitutional legitimacy of a brief patdown such as occurred here may and should reflect the horrendously more violent society in which we live, twenty-five years after *Terry*."); *State v McGill*, 234 Wis 2d 560, 568-569; 2000 WI 38; 609 NW2d 795 (2000) ("The need for officers to frisk for weapons is even more compelling today than it was at the time of *Terry*.  In 1966, 57 law enforcement officers were feloniously killed in the line of duty and 23,851 officers were assaulted. . . .  Although the number of officers killed in the line of duty has increased only slightly (61 officers killed in 1998), the number of assaults on officers has more than doubled (59,545 line-of-duty assaults in 1998).").  According to the National Fraternal Order of Police, "378 [police] officers were shot in the line of duty in 2023, the highest number the FOP has ever recorded."  See Fraternal Order of Police, *378 Officers Shot in the Line of Duty in 2023* <https://fop.net/2024/01/378-officers-shot-in-the-line-of-duty-in-2023/> (posted January 2, 2024) (accessed May 16, 2024) [https://perma.cc/AC2A-38j4].  Unfortunately, Michigan is not immune from the national trend of increased violence against police officers.  See Hunter, *Assaults on Michigan Police Hit Record as Arrests Plunge*, The Detroit News (Jan 4, 2024) ("There were 1,751 officers assaulted in Michigan in 2022, the highest number in the Michigan State Police online database that goes back to 1997. . . .  Overall arrests statewide dropped to the lowest level in more than 50 years in 2022, meaning more cops were assaulted or obstructed during fewer interactions with residents.").  The majority opinion asserts that I am somehow critiquing *Terry*, but the *Terry* decision turned heavily on the concern for officer safety.  See *Terry*, 392 US at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").  My opinion does the same.

14

App DC 1; 895 F2d 1423 (1990) (holding that the *Chesternut* standard "assumes that the citizen is aware of police duties to keep the peace and prevent crime, and that that 'awareness, coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate . . . .' "), quoting *Gomez v Turner*, 217 US App DC 281, 288-289; 672 F2d 134 (1982).

In this case, because the encounter took place outside at night when it was dark, it was certainly reasonable for the police officers to use their headlights, spotlight, and flashlights[13] for their safety and the safety of others. See *State v Baker*, 141 Idaho 163, 167; 107 P3d 1214 (2004) ("We agree with the State that an officer is not constitutionally required to choose between a consensual encounter in the dark or turning on a spotlight and thereby effectuating a detention that may not be supported by reasonable suspicion. A rule that an officer's use of a spotlight creates a per se detention would discourage officers from using such lights when necessary for their safety or the safety of others."); *Cascio*, 932 P2d at 1388 (stating that the officers' use of flashlights and a spotlight was a practical

---

[13] Once again, the majority has focused on a fact—the officers' use of flashlights—that was not the subject of a factual finding by the trial court, and I could locate no testimony in the record on this topic. A video of the police encounter shows one deputy shining a flashlight into the passenger side of the vehicle, but the video does not show the officers' approaching the vehicle, and it is unclear whether the flashlight was shined before or after the officers developed reasonable suspicion to conduct a *Terry* stop. The majority's analysis demonstrates the foolhardiness of an appellate court trying to make factual findings on issues that were not the subject of the proceedings below. See *People v Paille #2*, 383 Mich 621, 627 n 2; 178 NW2d 465 (1970) ("The trial court is our arena for the test of truth. There the contesting parties and their witnesses appear face to face in flesh and blood with weight and size and demeanor under the eye of the trial judge. He sees the averted glance, marks the hesitation, detects the note of hysteria in the voice of a witness whose words may be calculated to deceive. The cold words on a printed page show none of these essentials to the search for fact.") (quotation marks and citations omitted).

necessity because it was getting dark and that no seizure had occurred because lights were not used in an intimidating manner); *Tanguay*, 918 F3d at 7-8 (refusing to hold that the use of a "flashlight and floodlight to illuminate the interior of the [vehicle]" amounted to a seizure because doing so "would be to prevent officers from safely visiting parked vehicles at night").[14] In this case, the spotlight and flashlights were used as a matter of course— and like in *People v Tacardon*, 14 Cal 5th 235, 248; 521 P3d 563 (2022), "[t]here was no evidence [they were] unusually bright or flashing, or that [the defendant] was blinded or overwhelmed by the light."

---

[14] See also *Luedemann*, 222 Ill 2d at 561-563 (collecting cases holding that use of a spotlight, high beams, or takedown lights is not a seizure); 4 LaFave, Search & Seizure (6th ed), § 9.4(a), p 613 n 130 (collecting cases holding that seizure generally occurs when officers use the overhead emergency lights on their police vehicles but not when the officers use spotlights). See generally *Douglass*, 467 F3d at 624 ("[T]he fact that the officers used their flashlights is insignificant and certainly is not a reason that would have caused a reasonable person to feel compelled to remain for it was 2:30 a.m. in a dark parking lot."); *State v Gilliam*, 292 Neb 770, 780; 874 NW2d 48 (2016) (finding no seizure because a "person, parked on the side of the street at night or in the early morning hours, would understand that there are a variety of reasons an officer may activate his overhead lights before approaching him, including officer safety"); *People v Tacardon*, 14 Cal 5th 235, 246-247; 521 P3d 563 (2022) ("[A] reasonable person would understand that spotlights can have a practical function that differs from the essentially communicative function of emergency lights. A spotlight can be used to illuminate the surrounding area for safety or other purposes unrelated to the projection of authority. Proper illumination enhances the officer's ability to make ' "swift, on-the-spot decisions" ' that are appropriate to the circumstances. And, in certain circumstances, depending on how the spotlight is used, it might help both the officer and the civilian see what the other is doing and make decisions accordingly.") (citations omitted). Rather than engaging with these cases, the majority makes the demonstrably incorrect and unsupported assertion that "[w]hether a police officer's prudential procedures are justified has little bearing on whether a reasonable person might feel free to leave or otherwise terminate an encounter." See *ante* at 12.

16

Next, the majority finds it significant that "the police officers here exited their patrol vehicle and approached defendant's car on either side . . . ." Once again, the majority has identified a fact that will be present in virtually every police encounter with a citizen in a parked vehicle—approaching on both sides of a vehicle is a routine practice and is surely the safest way to investigate the occupants of a vehicle. But the majority declares—again without any citation of authority—that a reasonable person would not attempt to move their vehicle when officers are in such close proximity. Many courts have held to the contrary. See, e.g., *Douglass*, 467 F3d at 624 ("Nor did the officers' stance on either side of [the defendant's] car convert the encounter into a seizure because he still could have declined to answer their questions and driven away . . . ."); *United States v Dingess*, 411 Fed Appx 853, 856 (CA 6, 2011) (finding that two officers "simultaneously approach[ing] the driver's and passenger side of the vehicle" is a factor that "suggest[s] only typical police conduct, not activities indicative of a seizure"). How else could the police conduct their investigation, by using a drone or rappelling down from a helicopter?

Also confusing is the majority's fixation on the fact that the officer intended to initiate contact with defendant, as though it is somehow a strike against the deputies.[15] It makes little sense to credit law enforcement's efforts only if their contact with a suspicious vehicle is accidental. But this does not stop the majority from counting as coercive the fact

---

[15] Citing four pages of this Court's opinion in *Lucynski*, 509 Mich at 643-646, the majority adds this fact to its description of *Lucynski*'s holding. See *ante* at 10 (describing the majority's holding in *Lucynski* as being that "under the totality of the circumstances, *it was clear that the officer meant to initiate contact with the defendant* and that the defendant was not free to leave") (emphasis added). But it is unclear where this fact comes from in that opinion or why it is relevant to the holding—unsurprisingly, none of the authorities cited in *Lucynski* references it as a factor in the seizure analysis.

17

that the officers in this case "were there solely to make contact with defendant." *Ante* at 12. The Supreme Court of California recently rejected a rule similar to the one the majority now adopts, i.e., that "any person who is aware of police scrutiny and is then illuminated by a spotlight is necessarily detained." *Tacardon*, 14 Cal 5th at 249. The court acknowledged that "[a] person approached by an officer may well consider himself the object of official scrutiny [because,] [i]ndeed, he is. An officer of the law has initiated a contact for some reason and is requesting interaction." *Id*. But then it quickly rejected the argument that a detention occurs whenever a person realizes he or she is the subject of directed scrutiny by a police officer. See *id*. ("A detention occurs, not the moment a person knows an officer would like to interact, but when a person would reasonably believe he or she was not free to leave or otherwise terminate the encounter, and submits to the officer's show of authority.") (quotation marks and citation omitted). And really, how could it be otherwise? It is hard to know why we would even have police if they cannot purposely initiate contact with citizens whom they suspect of engaging in illegal activity. But, by picking yet another fact that will seemingly be present in every police encounter and pretending that it somehow signals wrongdoing, the majority reveals its disdain for routine, safe, and widely accepted law enforcement practices.[16]

---

[16] In a footnote, Justice WELCH mentions a proposal by a law professor that would, if adopted, make Michigan the only state where police officers were prohibited from even initiating contact with a person unless they had reasonable suspicion that the person was involved in criminal activity. See *ante* at __ n 1, quoting Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining when Fourth Amendment Activity Begins*, 79 J Crim L & Criminology 437, 442 (Summer 1988). But it is unclear why a new test would be needed given that the majority's seemingly literal application of the *Mendenhall-Royer* test, if it becomes the norm in our state, will "result in virtually all police-citizen encounters being characterized as seizures . . . ." *Bright Line Seizures*, 79 J Crim L & Criminology at 439. See also 4 LaFave, Search & Seizure (6th ed), § 9.4(a), p 595 ("[I]f the ultimate issue

Considering all of the circumstances of this case, it is obvious that defendant was not illegally seized in violation of the Fourth Amendment at the initial stage of this encounter, i.e., when the deputies parked their patrol car near defendant's vehicle, put on their spotlight, and initially approached his vehicle. See *Cascio*, 932 P2d at 1383, 1386-1388 (determining that there was no seizure when two deputies parked 10 to 20 feet behind the defendants' van, trained their spotlight on the van, used their flashlights to see into the van, and approached (and thereby came into close proximity to) the passenger side of the van on foot); *Tacardon*, 14 Cal 5th at 247 (concluding that no seizure occurred where the deputy parked 15 to 20 feet behind the defendant's parked car, employed the spotlight, and began to approach on foot).[17]

[of whether a seizure occurred] is perceived as being whether the suspect would feel free to walk away, then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure.") (quotation marks and citation omitted). As Professor LaFave makes clear, "[t]he *Mendenhall-Royer* standard should not be given such a literal reading as to produce such a result." *Id*. Other jurisdictions have followed his advice. See note 6 of this opinion.

Justice WELCH also mistakenly asserts that "some federal decisions have gone so far as to suggest that social pressure to cooperate with law enforcement requests is legally irrelevant," *ante* at 5, n 3, but in reality, that point has been repeatedly emphasized by state and federal courts across the country. See note 6 of this opinion and the surrounding text.

[17] The majority's protestations that it has not yet found that the seizure in this case was illegal are a bit disingenuous. On remand, the trial court held that the officers did not have reasonable suspicion at this initial stage of the encounter, and the Court of Appeals dissenting judge agreed with this holding. See *Duff* (SHAPIRO, P.J., dissenting), unpub op at 3 (noting that "[i]t is well-settled that '[a] lone automobile idling in a darkened parking lot late at night does not, without more, support a reasonable suspicion of criminal activity.'") (second alteration in original), quoting *People v Freeman*, 413 Mich 492, 496; 320 NW2d 878 (1982). It is unclear why the majority declines to reach this issue given that it is inextricably intertwined with the question of whether this encounter violated defendant's Fourth Amendment rights and the issue is certainly ripe for appellate determination. If the majority believes it is likely that the officers had a reasonable suspicion of criminal activity before they parked and approached defendant, then this

19

## IV. CONCLUSION

While the majority begins by noting that the Fourth Amendment is not implicated when a law enforcement officer merely approaches a person to ask questions, it ends by reaching the opposite conclusion. The brief encounter between the officers and defendant in this case is certainly not the type of "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals" that the Fourth Amendment was intended to prevent. *Mendenhall*, 446 US at 553-554 (opinion by Stewart, J.) (quotation marks and citation omitted). Instead, it is yet another example of excellent police work denigrated by our Court as illegal activity. See, e.g., *People v Lucynski*, 509 Mich 618, 672; 983 NW2d 827 (2022) (ZAHRA, J., dissenting) ("Deputy Robinson's conduct in this case was not only reasonable, it was exemplary, good police work. He should not be criticized for his conduct; instead, he should be congratulated.").

As I noted at the outset, it is hard not to notice a trend in this Court's recent Fourth Amendment jurisprudence toward characterizing every encounter between a citizen and the police as a "seizure"—a trend that will make the work of policing more dangerous and the public less safe from criminal activity.[18] In his influential concurrence in *Mendenhall*,

___

opinion will turn out to be completely unnecessary to the resolution of this case and will have been a complete waste of judicial resources. The majority should not hide from the consequences of its decisions by parsing legal issues in this fashion.

[18] See *Lucynski*, 509 Mich at 634-646, 656-657 (holding that the defendant was seized when the officer parked a few feet behind the defendant's vehicle, which was parked on a single-lane driveway on a rural road, even though the defendant was not in the vehicle); and *People v Hicks*, ___ Mich ___, ___ (Docket No. 165663) (July 26, 2024) (declaring that the defendant was unlawfully seized when police officers approached him while he was sitting in the open door of a vehicle parked in a public street and immediately seized his pistol after seeing his pistol holster clip in plain view).

20

Justice Stewart presciently warned about the impact of opinions that characterize routine encounters as seizures:

> [C]haracterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished . . . ." [*Mendenhall*, 446 US at 554 (opinion by Stewart, J.) (citation omitted).]

The majority misapplies the *Mendenhall-Royer* free-to-leave test and characterizes this routine street encounter as a seizure. Its opinion does not provide clarity to lower courts and law enforcement officers and will only cause confusion.[19] At a minimum, the majority is imposing "wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Mendenhall*, 446 US at 554 (opinion by Stewart, J.). And as a direct consequence of its opinion, the work of policing will be more difficult and more dangerous, and our communities will be less safe from criminal activity. For these reasons, I respectfully dissent.

David F. Viviano
Brian K. Zahra

---

[19] Indeed, it seems only fair to ask the majority what message they are sending to law enforcement. What should the deputies have done in this circumstance? Not investigate suspicious activity at night in an elementary school parking lot? Not use headlights, a spotlight, or a flashlight at nighttime and in the dark for officer safety? Not approach the vehicle on foot but instead somehow attempt to investigate from within their police car? How far away from the suspect should they park?